UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PLAINVILLE BOARD OF          :
EDUCATION,

   Plaintiff,                :

V.                           :     CASE NO. 3:09-CV-241(RNC)

R.N., BY HIS PARENT AND NEXT :
FRIEND, MRS. H.,

   Defendant.                :

RULING AND ORDER

    The Plainville Board of Education ("the Board") brings this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq.*, challenging the decision of an independent hearing officer ("IHO") that the Board failed to provide a free appropriate public education ("FAPE") to a student, R.N., as required by the IDEA, during the 2007-2008 and 2008-2009 school years, and that it must reimburse R.N.'s parent, Mrs. H., for the cost of his attendance at a private residential school during the 2008-2009 school year.  Cross motions for summary judgment have been filed.  For reasons that follow, I affirm the IHO's decision.  The defendant's motion for summary judgment is therefore granted and the plaintiff's motion for summary judgment is denied.[1]

---

    [1] R.N. has also filed a motion for partial judgment on the pleadings.  That motion is granted in part and denied in part as discussed below.

1

Background

R.N.'s Educational History: 2003-2006

At all relevant times, R.N. was a public school student in Plainville, Connecticut.  In November 2003, when R.N. was in second grade, his mother, Mrs. H., gave the Board the results of a private psychiatric evaluation diagnosing R.N. with childhood onset bipolar disorder.  In February 2004, a Planning and Placement Team ("PPT") identified R.N. for special education and related services under the category of Emotional Disturbance. The PPT established an initial Individualized Education Program ("IEP") to address R.N.'s educational needs.  See 20 U.S.C. § 1414(d) (2006).  Even with this program, R.N. had trouble throughout the 2004-2005 school year, including one suspension and a stay in a psychiatric hospital.

In the fall of 2005, the PPT adjusted R.N.'s program by adding more services.  Following a behavioral episode at school in December 2005, R.N. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and bipolar disorder.  Mrs. H. retained Dr. Steven Mattis, a neuropsychologist, to evaluate R.N. R.N's condition deteriorated between December 2005 and January 2006 leading Dr. Mattis to recommend that R.N. be placed in a therapeutic school until his condition stabilized.  A doctor at Wheeler Clinic agreed.  As a result, the PPT recommended a change of placement to a therapeutic day school.

In February 2006, Dr. Demitri Papolos, a child pyschiatrist, evaluated R.N. and identified his aggressive behavior in the school setting as a serious problem.  Dr. Papolos cautioned that using restraint and seclusion to deal with R.N.'s problematic behavior could result in aggression due to greater fearfulness in the child and that R.N. should not be left alone in a timeout room because he could bang his head and injure himself.

In March 2006, R.N. was placed at the Northwest Village School ("NVS"), a therapeutic day school that is part of the Wheeler Clinic.  In response to R.N.'s at times verbally and physically abusive behavior, NVS staff sometimes used "Level III interventions," including therapeutic holds and closed door time-outs.  As R.N. adjusted to NVS, however, his behavior improved.

Throughout 2005 and 2006, the Board attempted to get a release from Mrs. H. to speak with R.N.'s private care providers. Mrs. H. granted limited releases, but indicated a preference to facilitate communication between the Board and the providers. She also declined the Board's request for an evaluation by Dr. Irene Abramovich.

<u>2006-2007 School Year</u>

R.N. spent the 2006-2007 school year at NVS, where his behavior continued to fluctuate.  Mrs. H. complained about several disciplinary practices at NVS, including locking R.N. in a timeout room with concrete walls, even though he was known to

bang his head, and forcing R.N. to clean up after himself if he urinated or vomited in the timeout room.

In January 2007, Mrs. H. transferred R.N.'s psychiatric care to Dr. Papolos. At the same time, R.N.'s triennial evaluation was concluded.[2] Psychological testing placed R.N.'s overall performance at the borderline range of intellectual functioning.

In April 2007, the PPT met to review the results of the triennial evaluation and revise the IEP as necessary. Mrs. H. requested an independent neuropsychological exam. The Board agreed to an independent exam, but Plainville's Director of Special Education, Maureen Schiffer, strongly objected to the testing on the basis that R.N. does not like to be tested and further testing would be harmful to him. Ms. Schiffer urged Mrs. H to reconsider her request for an independent evaluation.

In May 2007, the PPT conducted an annual review. The PPT agreed to change R.N.'s identified disability to Other Health Impaired, although the category of Serious Emotional Disturbance was believed to be more appropriate. The PPT found that R.N. had not mastered any of the goals or objectives listed in the IEP and that with regard to many of the goals and objectives only minimal progress had been made. The PPT noted that R.N. had variable attention and effort, was easily overwhelmed, and had poor work

---

[2] The IDEA mandates that students be assessed every three years.

completion and engagement.

The IEP that resulted from the annual review called for small group or individualized instruction for all academics, small group instruction throughout the school day, and a behavioral management plan that included time out.  The PPT planned to provide R.N. with extended school year ("ESY") services in the summer of 2007.

During that summer, the Board arranged for an evaluation of R.N. by Leanne Gmeindl, M.S., who administered a variety of academic tests.  She concluded that a multisensory approach to learning would be best for R.N.  Over the summer, Dr. Timothy Belliveau, a neuropsychologist, performed the independent evaluation previously requested by Mrs. H.  In his September report, Dr. Belliveau concluded that R.N. had regressed in intellectual functioning and had an adjustment disorder.  Dr. Belliveau found that while R.N. had made poor progress up to that time, he was capable of making significant academic progress.

<u>2007-2008 School Year</u>

R.N. began the 2007 school year at NVS at a new grade level. Although R.N. adjusted positively overall, he had problems with some of his new teacher's policies, including strictly enforced discipline for incomplete homework.  On September 25, 2007, R.N. was sent to the emergency room when his behavior escalated.  Mrs. H. believed that the new discipline system in R.N.'s classroom

had escalated his behavior, so she requested a change of placement.  While Mrs. H. investigated placement options, R.N. received one to two hours per day of homebound instruction.

The PPT ultimately agreed to place R.N. at the Intensive Education Academy ("IEA").  In order to make sure that IEA would be an appropriate fit, IEA conducted a three week intake process, during which R.N. attended the school with his mother for about two hours per day.

On November 19, 2007, following an auditory processing evaluation and a review of Dr. Belliveau's full report, the PPT recommended that R.N. enroll in IEA full time.  The PPT determined that IEA staff would use R.N.'s existing IEP (established in May 2007) and that the PPT would reconvene in January to revise the IEP.

On January 3, 2008, the PPT convened to review the IEP. R.N. had been hospitalized in December due to a psychiatric episode.  In light of this recent hospitalization, the PPT recommended that R.N. return to school on a shortened academic day until he remained stable for five consecutive days.  IEA indicated that further acts of physical aggression by R.N. would lead to discussion of another placement.

The PPT noted that R.N. required intensive direct instruction in a number of areas.  It found that R.N. had not been exposed to grade level social studies and science for

several years.  R.N.'s progress was declining on the goals and objectives in his IEP, and he had not mastered any.  Mrs. H. did not register an objection to R.N.'s programming prior to this meeting nor at the meeting itself.

At this time, the IEP provided for 30.75 school hours per week.  However, from January 5 to May 13, 2008, per the PPT's decision, IEA did not instruct R.N. in science, social studies, or specials, and he was dismissed at 11:00 AM.  His counseling was reduced to fifteen minutes and his services were reduced.  He did not receive homebound instruction.

In March 2008, R.N. began taking Cynthroid for a thyroid deficiency.  He was noted to be off task at school during this time.  Attempts to return him to a full day schedule were not successful.  He was hospitalized again in April for psychiatric issues.  Despite these difficulties, Mrs. H. notified the Board that she wanted R.N. to continue at IEA for the 2008-2009 school year.

On May 14, 2008, the PPT revised R.N.'s programming to include a one-to-one paraprofessional, additional behavior tracking, and full days.  He was performing below grade level in all areas.  At this meeting, Mrs. H. presented letters from Dr. William Corson – R.N.'s treating psychiatrist – and Dr. Papolos

recommending residential placement.[3]

On June 5, 2008, R.N.'s behavior escalated at IEA and he struck two staff members.  IEA suspended R.N. then discharged him due to safety concerns.[4]

At a PPT meeting on June 11, 2008, Mrs. H. was informed of IEA's action.  The PPT discussed possible alternative placements. The Board proposed High Road School, starting with summer ESY programming.  Mrs. H. disagreed with this recommendation because High Road, like NVS, used restraint and seclusion.  Mrs. H. suggested residential placement, but the Board disagreed because they believed residential placement would be too restrictive. The Board sought to have R.N. evaluated by Dr. Abramovich, the Board's consulting psychiatrist.  Dr. Abramovich believes residential programs are generally harmful and had never recommended one to the Board.[5]  Ultimately, Mrs. H. agreed to

─────────────

[3] While treating R.N., Dr. Papolos found that R.N. had poorly regulated attention focus, which leads to significant academic difficulties.  R.N. had particular difficulty making transitions between different contexts, which causes problems with transport to and from school and between classes.  At times R.N. exhibited uncontainable violent behavior.  The use of restraint or seclusion to address his behavior tended to exacerbate the problem.  Dr. Papolos believed that R.N.'s condition required residential placement in order for him to learn.

[4] Because IEA does not use physical restraint, they were unable to handle a child as physically aggressive as R.N.

[5] The Board attempted to secure Mrs. H's consent for an evaluation by Dr. Abramovich on multiple occasions starting in June 2008.  Mrs. H. did not give her consent, stating that the

visit High Road.  The next scheduled PPT was postponed in order to give her time to make this visit, and she requested that R.N. not be placed elsewhere until after the visit.

Summer 2008

Upon visiting High Road in July 2008, Mrs. H. found that it employed restraint and seclusion comparable to NVS, and that R.N. would have to work independently for two-thirds of the day.  For these reasons, she rejected the placement.

That month, Dr. Mattis reevaluated R.N.  His evaluation found that R.N.'s academic skills were poorer than they had been in 2005.  He concluded that R.N. needed a predictable, structured environment to feel safe and therefore recommended residential placement for R.N.

On August 26, 2008, the PPT met to discuss the issue of placement.  Mrs. H. was represented by counsel.  She provided the Board with the updated report from Dr. Mattis.  On the basis of his recommendation, as well as those of Dr. Papolos and Dr. Corson, Mrs. H. requested placement for R.N. at the F.L. Chamberlain School ("Chamberlain"), a residential school in Massachusetts that provides year-round special education and therapeutic treatment.[6]

_____

Board had failed to provide her with information she needed to make an informed decision.

[6] Chamberlain serves approximately 110 students and has a staff of over 150 people, including qualified clinicians and

The Board disagreed that residential placement was necessary and recommended a diagnostic placement at the Manchester Memorial Clinical Day School ("MMCDS").  The Board said it needed more information to determine whether residential placement was appropriate.  Mrs. H. rejected the Board's proposed diagnostic placement.

Fall 2008 - Enrollment at Chamberlain

On September 8, 2008, Mrs. H. wrote a letter to the Board indicating that she intended to enroll R.N. at Chamberlain right away.  She stated that she would not allow the Board to speak with Chamberlain unless she was present.  She also refused to allow the Board to conduct evaluations unless they were conducted by Chamberlain staff or during school breaks.  The Board responded with offers to have Dr. Marshall Gladstone evaluate R.N. at Chamberlain, and to have Dr. Abramovich evaluate him during a school holiday.  Mrs. H. requested information about the qualifications of these evaluators and the tests they would administer.  She refused to consent to these evaluations without the requested information and the Board did not provide it.

On September 22, 2008, Mrs. H. and her husband met with Kay Tapper, the Program Director at MMCDS.  Ms. Tapper told them that R.N. would not be a candidate for MMCDS because his academic

_____

psychiatrists.  The school does not have timeout rooms.  Students are provided opportunities to interact with non-disabled peers.

performance was so low and his avoidant behaviors were so intense.

As of late December 2008, R.N. was the lowest functioning student at Chamberlain, and did not have devoted one-to-one support.  He received his classes in one classroom, and there was no occupational therapy room with equipment for him to use.  His teachers were not certified in special education.  R.N. received therapy with Ms. Emily Lannigan, who was not certified to deliver cognitive behavioral therapy, and with an unlicensed clinician who was an intern.  Ms. Schiffer had visited Chamberlain and did not feel it was an appropriate placement for R.N.

However, R.N. was taking core academic courses, as well as electives.  He spent 7.5 hours per day in class.  He had seven classmates and two teachers.  Since enrolling at Chamberlain, he had not missed any school days.  Nor had he been physically restrained.  Accounts of R.N.'s adjustment to Chamberlain indicated he was doing very well and making academic progress.

Procedural History

On December 26, 2008, the IHO issued a detailed written decision.  The IHO found that the Board failed to provide FAPE to R.N. for the 2007-2008 school year.  She also found that the Board did not propose a plan that would provide FAPE to him for the 2008-2009 school year.  Finally, she found that the Board was obligated to reimburse Mrs. H. for R.N.'s year at Chamberlain.

In February 2009, the Board brought this action challenging the IHO's decision.  The amended complaint asked the Court to do the following: (1) enter a preliminary injunction requiring Mrs. H to consent to a psychiatric evaluation of R.N. by a qualified professional chosen by the Board; (2) reverse the IHO's decision with regard to the rulings against the Board; (3) find that the 2007-2008 IEP was appropriate, that the Board met R.N.'s needs, and that the Board therefore is not required to reimburse Mrs. H for the costs of R.N.'s 2008-2009 placement at Chamberlain; (4) find that the Board's proposed diagnostic evaluative placement at MCDS was appropriate and necessary in order to devise an appropriate educational program for R.N. for the 2008-2009 school year and that the Board met its legal obligations when it made this recommendation; (5) find that the Board should be reimbursed for the costs of tuition paid to Chamberlain and Mrs. H. pursuant to the IHO's order; and (6) declare that Mrs. H. should not recover an award of attorney's fees under the IDEA.

The parties' filed cross-motions for summary judgment. In September 2010, the parties reached a settlement agreement resolving several aspects of this case ("the 2010 agreement"). The parties agreed on a 2010-2011 placement for R.N.  In addition, Mrs. H. agreed to allow the Board to evaluate R.N. in order to draft a prospective IEP.  The agreement states that it does not affect this litigation.

After the settlement was executed, R.N. filed a motion for partial judgment on the pleadings urging that many of the items of relief sought by the Board in the amended complaint can no longer be granted in light of the settlement (doc. 88).  R.N. contends that the Board's request for a preliminary injunction requiring Mrs. H. to consent to a psychiatric evaluation is moot because Mrs. H. has agreed to an evaluation.  The Board responds that there is still a live controversy because the Court can enter an injunction requiring Mrs. H. to comply with future evaluation requests.  The amended complaint, however, requested only "a preliminary injunction requiring Mrs. H. to consent to a psychiatric evaluation, and other evaluations as may be necessary at this time."  Compl. (doc. 9) at 24, ¶ 1.  Since Mrs. H. has agreed to allow an evaluation, and the Board has not sought an injunction regarding hypothetical future evaluations, the request for a preliminary injunction is moot.  To the extent R.N.'s motion seeks judgment on the Board's request for a preliminary injunction, it is granted.

The Board's other claims for relief ask the Court to reverse the IHO's rulings that the 2007-2008 IEP was not appropriate, Chamberlain was an appropriate placement, and the Board must pay the cost of R.N.'s 2008-2009 attendance at Chamberlain.  In his motion for partial judgment, R.N. argues for the first time that the Board cannot obtain reimbursement from Mrs. H. for R.N.'s

placement at Chamberlain because he was placed there pursuant to
the IHO's order, which is equivalent to a "stay put" pendency
provision.  See 20 U.S.C. § 1415(j) (2006); C.G. ex rel. B.G. v.
N.Y.C. Dep't of Educ., 752 F. Supp. 2d 355, 361 (S.D.N.Y. 2010).
The Board responds that Mrs. H. unilaterally placed R.N. at
Chamberlain.  Because this argument was not raised previously and
does not relate to the 2010 agreement, I decline to reach it.
Accordingly, there remains a live controversy as to whether the
Board provided FAPE to R.N. during the 2007-2008 and 2008-2009
school years, and whether the Board is required to pay for R.N.'s
placement at Chamberlain during the 2008-2009 school year.  With
regard to those issues, R.N.'s motion for partial judgment on the
pleadings is denied.  However, I conclude that the IHO's rulings
on these issues should be affirmed.

        Standard of Review

        Courts do not use the usual summary judgment standard when
reviewing administrative determinations under the IDEA.  Lillbask
ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77,
83 n.3 (2d Cir. 2005).  Instead of looking for disputes of
material fact, a court reviews the administrative record and any
further evidence presented under a preponderance of the evidence
standard.  Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 380
(2d Cir. 2003) (citing 20 U.S.C. § 1415(i)(2)(B)).  Under the
IDEA, judicial review of IHO decisions is "independent" but

14

"circumscribed"; courts must give "due weight" to the factual and educational determinations of the hearing officer, "mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." Lillbask, 397 F.3d at 82 (citation and internal quotation marks omitted, alteration in original). Courts do not, however, defer to an IHO's conclusions of law. Id.

Whether Mrs. H. is entitled to reimbursement for R.N.'s placement at Chamberlain involves a three-step inquiry.

> First, we examine whether the state has complied with the procedures set forth in the IDEA. Second, we consider whether the IEP developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits. . . . If . . . the IEP is procedurally or substantively deficient, we proceed to the third step and ask whether the private schooling obtained by the parents is appropriate to the child's needs.

Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005) (internal quotation marks and citations omitted). The first two steps in the analysis focus on whether the Board has provided FAPE to R.N.; the third focuses on whether Mrs. H. should be reimbursed.

Procedural Violations

R.N. alleges four procedural violations. He contends that the Board: (1) predetermined placement at High Road without considering evaluations by R.N.'s independent doctors in violation of 34 C.F.R. §§ 300.501(a), 300.502 (c) (2006); (2)

unilaterally discharged R.N. from IEA without parent input in violation of 34 C.F.R. §§ 300.501(a), (c) (2006); (3) failed to provide information requested by the parent regarding its proposed evaluations in violation of 34 C.F.R. § 300.503 (2006); and (4) failed to consider private evaluations in violation of 34 C.F.R. § 300.502(c) (2006).  The IHO did not ground her decision against the Board in procedural violations.  Even so, I examine each of R.N.'s allegations in turn.

Placement at High Road

The IDEA requires a Board to give parents the opportunity to review all education records with respect to the placement of their children and the provision of FAPE to their children.  34 C.F.R. § 300.501(a) (2006).  In her Conclusions of Fact, the IHO found that "it is not clear what information the Board relied upon in making this recommendation [to place R.N. at High Road] or what factors were considered in determining how placement at High Road would meet the Student's needs and provide FAPE."  This does not, however, constitute a violation of Section 300.501(a). "[T]he Act defines 'education records' as those records that 'contain information directly related to a student' and 'are maintained by' the school district."  Cerra, 427 F.3d at 194 (quoting 20 U.S.C. § 1232g(a)(4)(A)).  No evidence indicates that the decision to recommend High Road was based on district records related to R.N. that were not made available for Mrs. H's review.

The Board did not violate § 300.501(a).

To the extent defendant wishes to claim that the Board violated §§ 300.501(b)-(c) by failing to afford Mrs. H. an opportunity to participate in meetings and placement decisions, his allegations again fail.  Despite the Board's strong preference for High Road, it still discussed the placement decision with Mrs. H. and listened to her input.  See K.L.A. v. Windham Southeast Supervisory Union, 371 Fed. Appx. 151, 154 (2d Cir. 2010).  Further, because Mrs. H. would not accept the program, R.N. ultimately avoided placement at High Road.  The Board's actions in advocating for High Road while involving Mrs. H. in the process did not violate the IDEA.

The IDEA also requires the Board to consider any independent educational evaluation that a parent provides in any decision made with respect to the provision of FAPE to the child, as long as the evaluation meets agency criteria.  34 C.F.R. § 300.502(c). This issue is addressed below.

Unilateral Discharge from IEA

R.N. alleges that the Board also violated the requirement that an agency involve the parent in placement decisions by unilaterally discharging R.N. from IEA.  The record shows that IEA staff made the decision to terminate R.N. from the program due to safety concerns.  IEA is a private institution and its decision to terminate R.N. was beyond the control of the Board or

the PPT.  The Board had no obligation to involve the parents in this decision in which it was not itself involved.  Accordingly R.N.'s discharge from IEA did not violate the procedural safeguards of the IDEA.

<u>Failure to Provide Information Regarding Evaluations</u>

The IDEA requires that parents be provided with written notice of a proposed evaluation.  20 U.S.C. § 1415(b)(3) (2006); 34 C.F.R. § 300.503 (2006).  In and after June 2008, the Board sought to have Mrs. H. consent to an evaluation of R.N. by Dr. Abramovich.  Mrs. H. requested information from the Board regarding the purpose of the evaluations and the nature of the tests that would be done.  In response to those requests, the Board provided some information about Dr. Abramovich and the testing.  The IHO found that the information provided was insufficient to satisfy the informed consent requirement.

The Board has not shown by a preponderance of the evidence that the IHO's conclusion is erroneous.  The record indicates that the Board provided Mrs. H. with only general information about Dr. Abramovich.  The Board did not explain exactly what medical or behavioral conditions it sought to discover and did not specifically describe the methods of evaluation that would be used.  Failure to provide adequate written notice may violate the procedural safeguards of the IDEA even when the parent is involved in the overall decisionmaking process.  <u>Scruggs v.</u>

18

Meriden Bd. of Educ., No. 3:03-CV-2224 (PCD), 2007 WL 2318851, at *10 (D. Conn. Aug. 10, 2007).

Failure to Consider Private Evaluations

Under 34 C.F.R. § 300.502(c) (2006), the Board is required to consider independent educational evaluations ("IEEs") in making decisions regarding provision of FAPE.  The IHO determined that the Board failed to consider reports of IEEs by Drs. Papolos, Mattis and Corson that Mrs. H. provided to the Board. The Board contends that the IHO erred because § 300.502(c) requires an agency to consider an IEE only when the IEE meets agency criteria and the evaluations provided by Mrs. H. did not meet those criteria.  The Board points to its IEE policy, Ex. B-115, arguing that it requires an IEE to include classroom observation and formal meetings between the evaluator and Board personnel.  The IEEs provided by Mrs. H. did not meet these requirements.

The requirements listed in the Board's IEE policy document appear to apply only when a parent is seeking an IEE at public expense.  The policy states, "If the District agrees to finance an IEE, it will pay only for an IEE that is conducted by an individual who . . . complies with the criteria set forth herein."  Ex. B-115, at 14.  The policy then lists the criteria described above.  In addition, it states: "The District will consider all evaluations by qualified evaluators as part of the

19

planning and placement team process." Id. (emphasis added).  Mrs.
H. did not request funding for the IEEs.  Rather, she obtained
them at her own expense then presented them to the PPT.
Accordingly, the Board has not shown by a preponderance of the
evidence that the evaluations provided by Mrs. H. failed to
comply with its IEE criteria.  The Board was thus required to
consider the evaluations under § 300.502(c).

Plaintiff, then, committed two procedural violations: it
failed to provide adequate notice of its proposed evaluations,
and it failed to consider R.N.'s IEEs.  However, violations of
procedural safeguards result in a denial of FAPE only if they
"(I) impeded the child's right to a free appropriate public
education; (II) significantly impeded the parents' opportunity to
participate in the decisionmaking process regarding the provision
of a [FAPE] to the parents' child; or (III) caused a deprivation
of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii) (2006).
I need not consider whether these procedural violations, in
themselves, resulted in a denial of FAPE because I find that
R.N.'s IEP was not reasonably calculated to provide benefits, and
as a result, FAPE was not provided to him.

Substantive Violations

To provide FAPE to a child, the Board not only must comply
with the IDEA's procedural safeguards, it must also craft an IEP
that is "reasonably calculated to enable the child to receive

educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982). This does not mean that a school district must furnish "every special service necessary to maximize each handicapped child's potential." Id. at 199. Instead, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." Cerra v. Pawling Cent. Sch. Dist, 427 F.3d 186, 195 (2d Cir. 2005) (internal quotation marks omitted).

The IHO found that R.N.'s programs for 2007-2008 and 2008-2009 were not appropriate. The Board urges that the program for 2007-2008 was appropriate, and that Mrs. H. prevented the formation of a program for 2008-2009 by placing R.N. at Chamberlain. Accordingly, it is necessary to decide whether these IEPs were reasonably calculated to confer educational benefits on R.N.

In reviewing an IHO's ruling, the officer's conclusions about the educational appropriateness of an IEP are entitled to substantial deference in view of his or her "special expertise in making judgments concerning student progress." Cerra, 427 F.3d at 195. The IHO's findings in this area may not be overturned "absent objective evidence in the record suggesting that the [IHO] has reached an erroneous conclusion." Id. At 196. Under

this standard, the IHO's determination that the IEPs for 2007-2008 and 2008-2009 were inadequate must be affirmed.

<u>The 2007-2008 School Year</u>

The IHO found that the Board failed to provide FAPE during the 2007-2008 school year.  In other words, she found that the Board failed to provide an IEP reasonably calculated to enable R.N. to receive educational benefits.  The record supports this conclusion.  While attending NVS, R.N. had to be forcibly transported to school by Wheeler Clinic staff, and Mrs. H. complained about the school's disciplinary tactics.  R.N. had sufficient trouble at NVS to alert the Board that the placement was inappropriate.  Between September and October 2007, R.N. received only one to two hours per day of homebound tutoring with no related services.  After the January 2008 PPT meeting, R.N. returned to school for shortened academic days.  A two-hour school day with no additional services was not sufficient to provide R.N. with a reasonable chance of making academic progress, especially in view of the PPT's determination that he should be in school 30.75 hours per week.  R.N. did not receive ESY services during the summer of 2008 to make up for this deficiency.[7]

---

[7] The Board contends that Mrs. H. specifically requested that R.N. not receive ESY, or at least that she gave the PPT the impression that she did not want ESY.  The record reflects that Mrs. H. asked that R.N. not be given a new placement until she had a chance to visit High Road (the Board's placement

In her ruling, the IHO concluded that R.N. declined during the 2007-2008 school year, and this finding contributed to her ultimate determination that the Board failed to provide FAPE to R.N. that year.  The Board challenges the IHO's determination as "Monday morning quarterbacking."  It is true that the adequacy of an IEP must be evaluated in light of the information available to the PPT when the IEP is created.  See B.L. v. New Britain Bd. of Educ., 394 F. Supp. 2d 522, 537 (D. Conn. 2005).  And the Second Circuit has declined to rule on whether courts may look to a child's actual progress to determine whether an IEP was reasonably calculated to allow a child to progress.  See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 251 n.1 (2d Cir. 2009) ("This Court has never ruled on whether district courts may consider retrospective evidence in assessing the substantive validity of an IEP[;] . . . [and] [w]e need not do so here.").  But the Court of Appeals has allowed retrospective evidence to show that placement in a private school was appropriate.  See Frank G. v. Bd. of Educ., 459 F.3d 356, 362, 367 (2d Cir. 2006).  I conclude that while retrospective evidence must be appropriately discounted to avoid hindsight bias, it is relevant and may therefore be evaluated: a failed plan is more consistent with an unreasonably calculated IEP than with a reasonably calculated one.  Therefore, I consider R.N.'s

---

recommendation), not that she declined ESY services.

progress during the 2007-2008 school year in my evaluation of whether the IEP for that year was appropriate.

Ample evidence shows that R.N. did not make progress during the 2007-2008 school year.  As of the spring of 2008, he was found to be making no progress toward his goals and objectives although he had made "satisfactory" or "limited" progress the previous year.  R.N. had numerous psychiatric episodes during the school year that required hospitalization and prevented him from attending school full-time.  Dr. Papolos opined that R.N. had deteriorated to the extent that he required a residential placement in order to achieve educational benefit.

The Board contends that R.N. did in fact make academic progress during the 2007-2008 school year.  It argues that the IHO failed to take into account the effects of R.N.'s behavioral condition on his progress.  See Mrs. B. v. Milford Bd. Of Educ., 103 F.3d 1114, 1122 (2d Cir. 1997)("[A] child's academic progress must be viewed in light of the limitations imposed by the child's disability.").  The record indicates the opposite.  The IHO was keenly aware of R.N.'s behavioral and medical impairments.  She concluded, however, that they were so severe as to prevent him from being educated in a nonresidential setting.  The Board also cites statements by Jill O'Donnell, IEA's Director of Education, that R.N. made demonstrable progress there.  The Court must defer to the IHO on matters of credibility and issues of educational

policy, and so I defer to the IHO's determination that R.N. did not make progress.

While it is true that no particular level of achievement is mandated by the IDEA, and while there may be some indications of progress by R.N. during the 2007-2008 school year, a preponderance of evidence in the record indicates that he regressed rather than progressed during that year.

The Board argues that Mrs. H's close involvement with all the decisions regarding R.N.'s program essentially immunizes them from any failure to provide FAPE. A parent's involvement with the IEP process is relevant in determining whether an agency has complied with the procedural requirements of the IDEA. The substantive requirement, however, is an objective test that examines the adequacy of the plan itself. See Walczak, 142 F.3d at 130 (district court "must examine the record for any 'objective evidence' indicating whether the child is likely to make progress or regress under the proposed plan"). It is true that a parent may not ask a school district to accede to her wishes and then try to punish it for doing so. See MM v. Sch. Dist., 303 F.3d 523, 333 n.14 (4th Cir. 2002). The Board, then, may not be punished for accepting Mrs. H's request that R.N. return to shortened school days in late March 2008. However, Mrs. H's participation in, and agreement with, the PPT's other decisions do not immunize the Board.

Cases cited by the Board in support of its position are inapposite. In Gregory M. v. State Bd. of Educ., 891 F. Supp. 695, 700-01 (D. Conn. 1995), the Court held that the parents' involvement in planning their child's IEP undermined their claim of a procedural violation of the IDEA. Whether Mrs. H. approved the Board's programs for R.N. would no doubt be relevant to a procedural claim that the Board did not sufficiently involve her in decisions, but that is not at issue here. Cerra, 427 F.3d at 195, holds that a district court must defer to the hearing officer and educational experts in determining whether an IEP is reasonably calculated to make progress.[8] Devine v. Indian River Cnty. Sch. Bd., 249 F.3d 1289, 1292 (11th Cir. 2001), finds that a parent bears the burden of proof when he or she challenges an IEP, and deference must be paid to educators who develop the IEP. The Eleventh Circuit opinion does not address whether a parent's acquiescence to a program bears on its substantive reasonableness. Finally, the Board cites my prior decision in Mr. & Mrs. M. v. Ridgefield Bd. of Educ., No. 3:05-CV-584 (RNC), 2007 U.S. Dist. LEXIS 24691, at *22 (D. Conn. Mar. 30, 2007). That case involved a procedural violation for failure to develop an IEP. I affirmed the IHO's finding that "the parents' own choices were intertwined with the Board's decisions in such a way

---

[8] At a different point, Cerra notes that parental involvement fulfills a procedural, not a substantive, obligation. See 427 F.3d at 192.

26

as to break the chain of causation between the Board's actions and any prejudice to [the student]'s education." Id.  The parents in Mr. & Mrs. M. had delayed testing that was necessary to completing the IEP.  In this case, the parent did not prevent the Board from taking steps necessary to completing the IEP.  It is clear from the record that Mrs. H. was indeed closely involved in the IEP process.[9]  But the Board has not established that it is entitled to an exemption from this requirement because of her involvement.

As the IHO observed, the Board made many laudable efforts to help R.N. succeed.  However, as Dr. Papolos testified, R.N.'s behavioral problems were simply too severe to allow him to receive a meaningful education in the settings provided by the Board.[10]  The record indicates that this fact was clear early on

---

[9] Most relevant is the fact that Mrs. H. approved R.N.'s shortened school day when he was not stable enough to attend the IEA full time.  The IHO found that R.N. did not receive a large number of the services listed in his IEP during this time period. However, the Board also agreed to this shortened day.  Moreover, the fact that R.N. required a shortened day highlights the inadequacy of his program in light of his serious behavioral problems.

[10] The Board argues that the IHO deprived it of its due process rights through several evidentiary rulings: The IHO allowed Dr. Papolos to testify when he had not complied with her instruction to bring relevant records to the hearing, and she allowed Ms. Lannigan to testify via telephone without a notary consistently present.  The Board has not demonstrated how these rulings prejudiced it and thereby rose to the level of a due process violation.  It had a full opportunity to cross-examine both witnesses while they were sworn in.

in the 2007-2008 school year, and that the measures taken were simply stopgaps designed to manage his behavior rather than provide him educational benefit.  Accordingly, I affirm the IHO's conclusion that R.N. was denied FAPE during the 2007-2008 school year.

<u>The 2008-2009 School Year</u>

It is undisputed that an IEP was never developed for the 2008-2009 school year.  Unless the Board provides an adequate defense, then, a finding that plaintiff failed to provide FAPE for that school year is proper.  The Board argues that it was unable to formulate a program for 2008-2009 year because Mrs. H. was unwilling to consent to a necessary evaluation.  After Mrs. H. refused to consent to an evaluation by Dr. Abramovich, the Board sought a diagnostic evaluative placement at MMCDS.  Mrs. H. placed R.N. at Chamberlain instead.

Mrs. H.'s unwillingness to consent to a reevaluation does not insulate the Board from liability for two reasons.  First, the IHO determined that the Board did not give Mrs. H. sufficient information on which to base informed consent for an evaluation.  Second, the IHO found that the Board, which already had extensive information about R.N.'s condition, did not identify any relevant new information that would be discovered through another evaluation.  Deference is owed to the IHO on these matters because they involve educational policy.

28

The Board contends that it had a right to reevaluate R.N. Under existing case law, the Board is entitled to evaluate a child before the first IEP is created, see P.S. v. Brookfield Bd. of Educ., 353 F. Supp. 2d 306, 314, 314 n.5 (D. Conn. 2005); when there is a question whether a child should receive special education at all, see Dubois v. Connecticut State Bd. of Education, 727 F.2d 44, 49 (2d Cir. 1984); M.L. v. El Paso Indep. Sch. Dist., 610 F. Supp. 2d 582, 599 (W.D. Tex. 2009); and when a required reevaluation, such as the triennial reevaluation, is scheduled, see Patricia P v. Bd. of Educ., 203 F.3d 462, 468 (7th Cir. 2000); Andress v. Cleveland Indep. Sch. Dist., 64 F.3d 176, 178 (5th Cir. 1995); M.S. v. Mullica Twp. Bd. of Educ., 485 F. Supp. 2d 555, 568 (D.N.J. 2007), aff'd, 263 Fed. Appx. 264 (3d Cir. 2008).  The case law does not establish that a board has a right to insist on an ad hoc reevaluation.  The IHO determined that R.N. did not require reevaluation and her decision is one of educational policy to which I defer.

Because the Board proposed no program for 2008-2009 beyond the MMCDS diagnostic, the IHO's conclusion that FAPE was denied for that school year is affirmed.

Appropriateness of Chamberlain

Mrs. H. has established that the Board denied R.N. a FAPE for the 2008-2009 school year; therefore, it is necessary to determine whether the private educational services the parents

obtained for R.N. were appropriate.  In making this assessment, I apply "the same considerations and criteria that apply in determining whether the School District's placement is appropriate," except that "[a]n appropriate private placement need not meet state education standards or requirements," and parents may not be required to educate their children with non-disabled peers to the maximum extent appropriate.  Frank G. v. Bd. Of Educ., 459 F.3d 356, 364 (2d Cir. 2006).

The Board urges that Chamberlain was not an appropriate placement due to several alleged deficiencies in its staffing and programming and because Drs. Mattis and Papolos were not specifically familiar with it.  The IHO determined that, although Chamberlain was not perfect, it was appropriate.[11]  I agree with the IHO's conclusion.  The record reflects that R.N. made significant progress during his time at Chamberlain.  He was able to attend classes for full days, and he developed a more positive self-image.  Factors beyond R.N.'s progress confirm that Chamberlain was an appropriate placement.  See Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 115 (2d Cir. 2007)("[A] child's progress is relevant to the court's review.  But such progress does not itself demonstrate that a private placement was

---

[11] The Board argues that the IHO erroneously disregarded the testimony of its experts and credited the testimony of Dr. Mattis and Dr. Papolos though they were not familiar with Chamberlain. I defer to the IHO's evaluation of the conflicting testimony.

appropriate.)  The record shows that R.N. required a residential placement because he had difficulty making transitions and needed therapeutic intervention throughout the day.

When a child's behavioral and emotional problems are so closely intertwined with his educational difficulties that he requires residential placement, the school board must pay for that placement as long as it is appropriate.  Mrs. B., 103 F.3d at 1122.  That is the case here.  Accordingly, Mrs. H. is entitled to reimbursement from the Board for the 2008-2009 school year.

III. Conclusion

For the foregoing reasons, plaintiff's motion for summary judgment (doc. 36) is denied and defendant's motion for summary judgment (doc. 61) is granted as to liability.  Defendant's motion for partial judgment on the pleadings (doc. 88) is granted in part and denied in part as discussed above.

Defendant's motion for summary judgment includes a request for attorneys' fees.  The fee request will be referred to Magistrate Judge Martinez.

So ordered this 31st day of March 2012.


                              /s/ RNC
                         Robert N. Chatigny
                    United States District Judge